UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PETER FRANCIS GERACI,

        Plaintiff,

   v.

THOMAS G. MACEY, and R. WILLIAM AMIDON,

        Defendants.

No. 14 CV 06876

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Peter Francis Geraci, a Chicago-based bankruptcy attorney, sued attorney Thomas Macey and a former employee, R. William Amidon, for allegedly misappropriating Geraci's proprietary software code.[1] Macey and Amidon now move for summary judgment. For the following reasons, defendants' motions for summary judgment are denied.

**I.    Background**

Chicago-based attorney Peter Francis Geraci became one of the largest filers of consumer bankruptcy cases in districts where he practiced. [178] ¶¶ 2, 4; [180] ¶¶ 2, 4; [187] ¶ 79.[2] He used computers and employed software engineers for his law

---

[1] Diversity jurisdiction exists because Geraci is a citizen of Illinois, Macey is a citizen of Florida, Amidon is a citizen of Florida, and the amount in controversy is over $75,000.

[2] Bracketed numbers refer to entries on the district court docket. [178] is Geraci's response to Macey's Local Rule 56.1 statement of facts and Geraci's 56.1 statement of additional facts; [180] is Geraci's response to Amidon's 56.1 statement of facts and Geraci's 56.1 statement of additional facts, and [187] is Macey's response to Geraci's 56.1 statement of additional facts. Amidon did not respond to Geraci's 56.1 statement of additional facts. To

practice since the 1980s. [178] ¶ 6; [187] ¶ 82. In the 1990s, Geraci used a program called SalesCtrl to help manage his practice.[3] [178] ¶ 7; [180] ¶ 7; [187] ¶ 82. At some point (the parties dispute when), the company that made SalesCtrl stopped supporting the product. [178] ¶ 12; [180] ¶ 12. Geraci wanted practice-management software that had the same "look and feel" of SalesCtrl. [178] ¶ 13; [180] ¶ 13. He investigated using off-the-shelf software, but deemed it inadequate. [187] ¶ 85.

In 1996, Geraci hired R. William Amidon, a computer programmer, as a full-time employee. [178] ¶ 9; [180] ¶ 9; [187] ¶ 83. Amidon signed an employment agreement in which he agreed not to share his work for Geraci with anyone else. [187] ¶ 83. The parties dispute whether Amidon was hired solely to write practice-management software or whether he was hired to perform general IT work. [178] ¶¶ 9–12; [180] ¶¶ 9–12; [187] ¶ 83. Geraci and his office manager worked with Amidon to develop "GapC."[4] [178] ¶ 14; [180] ¶ 14; [187] ¶ 87. Amidon used various programming tools to create GapC, including a licensed, code-generating program called "Zachary," which Geraci bought for Amidon to use on Geraci's premises. [178] ¶ 19; [180] ¶ 19; [187] ¶¶ 84–85. The parties dispute the level of programming sophistication and originality required to successfully create software using Zachary, and specifically to create GapC. [178] ¶¶ 20, 22–24; [180] ¶¶ 20, 22–24. The parties also dispute when GapC was developed (1996, according to Geraci, and

---

the extent this opinion references materials that were filed under seal, the seal is lifted and the parties will be directed to file public versions of the documents.

[3] The parties refer to it as SalesCtrl, SALESCTRL, SalesControl, and Sales Control.

[4] The parties refer to it as GapC, Gap(C), and GAP(C). "GAP" stands for "Geraci Automated Practice." [187] ¶ 87.

1998 according to defendants), but everyone agrees that Geraci made the GapC program available for his employees' use firm-wide by 1998 and that it had become Geraci's main database program by 1999. [178] ¶¶ 15, 25; [180] ¶¶ 15, 25.

Geraci believed that GapC belonged to him and wanted to protect it from disclosure. [187] ¶ 86. His computers and network were password protected, and the GapC source code was kept on office computer servers housed in a locked room. Geraci made his employees use RSA security tokens and made his programmers work in their own locked office. [187] ¶ 86; [180-2] at 19–20. The GapC source code was not accessible to Geraci's employees generally, and Geraci forbade removal of computer code from the office premises. [187] ¶ 86.

Classmates Kevin Chern and Thomas Macey graduated from law school in 1993. Chern went to work for Geraci, and Macey opened his own law practice. [178] ¶ 3; [187] ¶ 80. In 1996, Macey started Legal Helpers P.C., a consumer bankruptcy law practice. [178] ¶ 3; [187] ¶¶ 88–89. Macey's business plan called for Chern, then Geraci's employee, to be part of his "team." [187] ¶ 88. In 1997, Chern left Geraci's employ to work for Macey; he was Legal Helpers' first attorney hire. [187] ¶¶ 80, 89. Legal Helpers also hired other Geraci employees; Chern told them that Legal Helpers was "just like Geraci" and used "the same 'stuff' as you do over there." [187] ¶ 89. From 1997 to 2005, Legal Helpers experienced significant growth in its practice. [178] ¶ 4.

As early as 1996, Chern approached Amidon about working for Legal Helpers. [187] ¶ 88. Defendants contend that Legal Helpers asked Amidon to create

3

a new product to replace SalesCtrl with the same "look and feel;" Geraci, on the other hand, points to some evidence suggesting that Legal Helpers intended to model its software after Geraci's. [178] ¶¶ 7, 18; [180] ¶¶ 7, 18. Legal Helpers called their program "LH1."[5] LH1 was constructed using programming tools, including Zachary. [187] ¶ 93. The parties dispute whether Amidon independently developed LH1 using Zachary; Geraci maintains that LH1 is a knockoff of his GapC program. [178] ¶ 19; [180] ¶ 19. The parties also dispute whether LH1 was first used in 1998, or earlier. [178] ¶ 25; [180] ¶ 25. Legal Helpers stopped using LH1 in 2013, when it went out of business. [178] ¶ 25; [180] ¶ 25.

In 2006, Geraci discovered that Amidon had copied and removed computer code from Geraci's premises. [187] ¶ 86. He immediately fired Amidon and demanded Amidon return all of the CDs that he had removed from Geraci's premises. [187] ¶ 86. After Amidon was fired, Geraci's office manager emailed Macey asking if Amidon had attempted to sell software to Legal Helpers. Macey replied that Amidon did not mention or offer to sell any type of software. [187] ¶ 91.

In 2010, Geraci sued Macey, Amidon, and others in Illinois state court for violating the Illinois Trade Secrets Act and also sued Amidon for breach of contract. In August 2011, the trial court granted summary judgment in favor of all defendants on the issue of trade secret misappropriation, finding that GapC was not a trade secret. *Geraci v. Amidon*, 2013 IL App (2d) 120023-U, ¶¶ 65–66. To appeal that decision, Geraci voluntarily dismissed without prejudice his breach of contract

---

[5] The parties refer to it as LH1 and LH-1.

claim against Amidon. [158-10]; [158-11]; *Geraci*, 2013 IL App (2d) 120023-U, ¶ 67. The appellate court reversed the grant of summary judgment on the trade secret claims. *See generally Geraci*, 2013 IL App (2d) 120023-U. Geraci then filed the current suit in federal court, [1], and two weeks later voluntarily dismissed the state court action. [158-12].

## II. Analysis

### A. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Evidentiary Issues

#### 1. Expert Reports

Geraci submitted three unsworn expert reports in opposition to defendants' motions for summary judgment: his own expert report evaluating GapC as a trade secret ([179-8]); a report by Richard Weyand comparing the GapC source code with LH1 source code ([179-3]); and a report by David Haas assessing Geraci's damages ([179-5]). Unsworn expert reports are inadmissible under Federal Rule of Civil Procedure 56(e). *Estate of Brown v. Thomas*, 771 F.3d 1001, 1005–06 (7th Cir.

5

2014); *see Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996). Therefore, these expert reports are not considered, except to the extent that Macey and Amidon do not dispute facts relying on these materials. *See* Local Rule 56.1; *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562–63 (7th Cir. 2002) (factual assertions in an unauthenticated exhibit were treated as undisputed where nonmovant did not object to its admissibility or present evidence to challenge it).

Because these expert reports are inadmissible, it is not necessary to resolve Macey's reply argument that the reports do not meet the *Daubert* standard for admissible expert testimony admissibility. In anticipation of future proceedings, plaintiff is reminded that for expert testimony to be admitted at trial, the expert must be qualified by *relevant* knowledge, skill, experience, training, or education. *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). An expert's opinion cannot be speculative, and must be based on a reliable methodology and assist the trier of fact. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Legal opinions are reserved for the court and are inappropriate subjects of expert testimony. *United States v. Lupton*, 620 F.3d 790, 799–800 (7th Cir. 2010).

With these principles in mind, some of the opinions offered in these expert reports are unlikely to be admissible at trial. The Geraci report is particularly problematic. While Geraci may be able to demonstrate the requisite expertise and methodology for some of his opinions (e.g., relating to the consumer bankruptcy law industry), the report also includes speculative conclusions and topics for which Geraci is unlikely to establish his expertise or specialized knowledge (e.g., software

development). Rulings on the trial admissibility of expert testimony will be reserved until the parties have the opportunity to fully brief *Daubert* motions, but plaintiff is cautioned that Rule 702's requirements of reliability and relevance must be satisfied before the jury will be allowed to hear the testimony of a proffered expert. *Lupton*, 620 F.3d at 798. In addition, any opinion that GapC is a trade secret is a legal conclusion that would not be admissible witness testimony.

### 2. Hearsay and Authentication Objections

Macey also makes authentication and hearsay objections to a number of Geraci's exhibits. *See* [193] at 9. The following exhibits are inadmissible as unauthenticated and hearsay: email exhibits to the Kroll deposition [178-5] at 13–19; Geraci letter [178-22]; Vambanatt incident report [178-23]; EZPay log [179-4]. The following exhibits are inadmissible as unauthenticated, even though some are non-hearsay party admissions: Amidon and Macey emails [178-15], [178-24], [178-25], [178-26]; Market Trackers charts [179-1]; Amidon memos [179-2] (Macey also claims these were not disclosed in discovery). Geraci's interrogatory responses [179-7] (offered by Geraci in opposition to summary judgment) are inadmissible as hearsay. These materials are not considered as part of the summary judgment record. Macey also objects to the "Macey business plan" [178-10] as inadmissible hearsay, but it is a non-hearsay party admission; Macey does not object to the document on authentication grounds, and admits that a business plan was written. *See* [187] ¶ 88.

### 3. Geraci's Statements of Additional Facts

Geraci filed additional statements of material facts in opposition to each defendant's motion for summary judgment under Local Rule 56.1(b)(3)(c). Macey replied to Geraci's additional facts, but Amidon did not. Under Local Rule 56.1(a), all material facts set forth in a nonmovant's additional statement are deemed admitted unless controverted by the moving party. Therefore, Geraci's additional statements of material facts are deemed admitted by Amidon. This includes facts relying on unsworn experts' reports and on exhibits to which Macey objected, since Amidon never objected to this evidence. *See Metro. Life*, 297 F.3d at 562–63.

### C. Voluntary Dismissals

During the state court litigation, Geraci voluntarily dismissed his breach of contract claim against Amidon in order to appeal the grant of summary judgment to defendants on his trade secret claims. Then, after the Illinois appellate court reversed summary judgment, Geraci filed this federal action and voluntarily dismissed his trade secret claim against Amidon in state court.

Citing to Federal Rule of Civil Procedure 41(a)(1)(B), Amidon argues that Geraci's voluntary dismissal of his trade secret claim against Amidon in state court operates as an adjudication on the merits and is tantamount to a dismissal with prejudice. Under Rule 41(a)(1)(B), if the plaintiff dismisses an action without a court order and previously dismissed a state or federal action including the same claim, the notice of dismissal operates as "an adjudication on the merits." Rule 41(a)(1)(B) does not apply. Geraci never dismissed this action or any claims in federal court, and the state court dismissals were court-ordered (pursuant to

Geraci's motions) and were without prejudice. Geraci also dismissed each claim against Amidon only one time. Neither dismissal was an adjudication on the merits or was with prejudice. Geraci's claims against Amidon are not barred.[6]

### D. Trade Secret Claims

In order to establish a violation of the Illinois Trade Secrets Act, a plaintiff must establish that (1) a trade secret existed, (2) it was misappropriated, and (3) the owner of the trade secret was damaged by the misappropriation. *Liebert Corp. v. Mazur*, 357 Ill.App.3d 265, 280–81 (1st Dist. 2005). Here, the alleged trade secret at issue is the GapC source code. Geraci's complaint alleged that his trade secret included GAP software and code. *See* [1] ¶¶ 78, 82, 91, 92, 96, 98–101. During discovery, Geraci was ordered to identify his alleged trade secret with specificity, and he chose to use the term "GapC Software System." [59], [107]. Geraci failed to explain how that materially differed from the GapC source code, and the case proceeded with the source code as the only alleged trade secret.[7] [107].

Defendants jointly argue that the GapC source code is not a protectable trade secret, and therefore Geraci's trade secret claims must fail. Amidon also argues that he did not misappropriate anything and is entitled to summary judgment.

---

[6] Amidon also cites cases addressing dismissals and nonsuits in reference to the Illinois single-refiling statute (735 ILCS 5/13-217), res judicata, and collateral estoppel. Amidon does not specifically argue that any of these doctrines apply to bar Geraci's claims, however. Amidon makes no other argument for summary judgment on Geraci's breach of contract claim.

[7] Geraci's trade secret definition in the state court litigation was slightly different, as it was limited to GapC after 2003. The parties have not explained whether the GapC source code changed over time, or whether any such changes matter substantively in this case.

9

### 1. Existence of a Trade Secret

Under Illinois law, the existence of a trade secret is a question of fact, and "the question of whether certain information constitutes a trade secret ordinarily is best resolved by a factfinder after full presentation of evidence from each side." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (marks omitted). The Illinois Trade Secrets Act defines "trade secret" as information that:

> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

While both elements focus on the secrecy of the information sought to be protected, the first requirement "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large." *Learning Curve*, 342 F.3d at 722 (quoting *Pope v. Alberto-Culver Co.*, 296 Ill.App.3d 512, 515 (1st Dist. 1998)). The second requirement "prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection." *Id.* (citing *Jackson v. Hammer*, 274 Ill.App.3d 59, 67–68 (4th Dist. 1995)). In addition to these two statutory elements, Illinois courts have identified six common-law factors relevant to evaluating whether information qualifies as a trade secret: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which

the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id*. These factors are not a six-part test, but are "instructive guidelines for ascertaining whether a trade secret exists under the Act." *Id*.

The second element of § 1065/2(d)—whether the GapC source code was the subject of reasonable efforts to maintain its secrecy—is essentially undisputed. Geraci took several affirmative steps to maintain the confidentiality of GapC source code, including password-protecting computers and the network, storing computer servers in a locked room, requiring that all employees use RSA security tokens, and requiring programmers to work in their own locked office. The source code was not generally available to employees, and Geraci made Amidon agree not to share Geraci's work with others. Geraci also immediately fired Amidon upon learning that he had copied and removed code from Geraci's premises. These undisputed facts suggest that the GapC source code was strictly limited in "the extent to which the information is known by employees and others involved in the plaintiff's business" and that Geraci took significant measures "to guard the secrecy of the information." *Learning Curve*, 342 F.3d at 722.

Defendants instead attack Geraci's trade secret protection on the first element of § 1065/2(d): whether GapC was sufficiently secret so as to derive economic value from its secrecy. According to the defendants, GapC was neither truly "secret" nor of economic value because it was largely created using Zachary—a publicly-available, licensed programming tool—so anyone could have created a program similar to GapC. Viewing the disputed facts in the light most favorable to Geraci as the nonmovant, even without his expert reports and inadmissible exhibits, there are questions of fact regarding whether the GapC source code was sufficiently secret so as to derive economic value from it not being generally known. In particular, Geraci raises questions of fact over whether GapC had economic value, "the ease or difficulty with which [it] could be properly acquired or duplicated by others," and the "time, effort and money" expended by Geraci in developing GapC. *Learning Curve,* 342 F.3d at 722.

Defendants argue that the source code lacked value from its secrecy because it was not intended for sale or licensing, and is no longer in use. But defendants have pointed to no authority requiring the economic value of a trade secret to be derived from its use in sale or licensing. A company's internal information system can benefit its bottom line even though it is not a product sold by the business. The parties dispute whether practice-management software is necessary for running a consumer bankruptcy law practice, but there is no real dispute that the use of such software can be an asset by allowing a high volume of consumer bankruptcy cases to be handled efficiently. [187] ¶¶ 82, 85. It is not a stretch to infer that using

proprietary software to run a high-volume practice could impart a competitive advantage for a consumer bankruptcy law practice. Corroborating this inference is the undisputed relative success of Geraci's law practice and Legal Helpers when they both used practice management software. Geraci was consistently one of, if not the, largest filers of consumer bankruptcy cases by volume in the districts in which he practiced and Legal Helpers experienced "significant growth." [178] ¶ 4; [180] ¶ 4.

There are also disputed facts over whether a significant amount of time, effort, and money was expended in creating GapC, even without Haas's expert report on damages. Prior to hiring Amidon, Geraci attempted to hire other contractors to create customized software, but found their work too expensive. [187] ¶ 82. According to Geraci, he hired Amidon, a computer programmer, as a full-time employee to write practice-management software. [178] ¶¶ 9–12; [187] ¶ 83. In addition to Amidon's salary, Geraci also paid for licensing the Zachary programming tool. [187] ¶ 85. Assuming Amidon was a full-time programmer, that suggests a significant amount of time, effort, and money was spent on the development of GapC, even if GapC was up and running in a matter of months, as Macey argues. [187] ¶ 87.

And even without expert support to refute the code-generating functions of the Zachary programming tool and similarities between applications created using Zachary, there is evidence from which Geraci can make the case that the GapC code united useful features, identified by Geraci, into a single program designed by

13

Amidon that was not readily ascertainable by others in that industry. It is important to remember that "[i]n order to be considered a trade secret, a pattern, technique, or process need not reach the level of invention necessary to warrant patent protection," but instead "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001).

Geraci investigated off-the-shelf software, but could not find a program that united all of the functions that he deemed necessary for a high-volume consumer bankruptcy law practice. [187] ¶ 85. Even if the GapC code was largely assembled from the licensed Zachary programming tool and available code from other third parties, it also contained code written by Amidon and, according to Geraci's testimony, reflected input from Geraci's experience in the consumer bankruptcy law industry in order to create an effective program for his practice. [178] ¶¶ 42, 55; [180] ¶¶ 42, 55; [187] ¶¶ 84, 85. And although there were over 80,000 Zachary licenses sold to customers, and there is testimony that GapC software had similar features to other Zachary-created applications, the owner and president of Zachary testified that he was unaware of other bankruptcy law practice management software created with Zachary (other than GapC and LH1). [178] ¶ 21; [180] ¶ 21. These factors, when combined with Geraci's careful attempts to protect the confidentiality of the GapC source code, raise disputed questions of fact over

14

whether the GapC source code was a protectable trade secret. At the end of the day, a jury might find that little effort was required to create GapC or that a competitor could have easily recreated it, but that dispute cannot be resolved at summary judgment based on the current record.

Defendants point to Weyand's statement in the state court litigation to the effect that another team of programmers could independently develop similar software for the same amount of effort and cost if they had access to a bankruptcy law practitioner of Geraci's expertise for insight into product requirements. But viewing the facts in Geraci's favor, this only highlights that Geraci spent time, money, and effort in the creation of GapC. Weyand does not say that GapC is readily duplicated with little effort, but says that it would require the *same* amount of effort and cost as Geraci invested in its development. Given the factual dispute over the time, money, and effort required to create GapC, Weyand's statement is not dispositive.

Defendants also argue that GapC is similar to the computerized, direct mail system in *Computer Care v. Service System Enterprises, Inc.*, 982 F.2d 1063 (7th Cir. 1992), which was not a protectable trade secret. In *Computer Care*, the alleged trade secret was a computerized system for direct mailings to car owners. The system's individual features—e.g., sending reminder letters based on multiple triggers or at different service cycles, tracking customers, deleting nonresponding customers from a database—were not protectable trade secrets because they were ideas based on common sense business practices, and the plaintiff set forth no

15

evidence that it had expended substantial time or money in developing any of these ideas or features. *Id*. at 1072–74. The whole system was not a combination trade secret because it did "not take its individual features and transform them into something that is itself secret—that is, not generally known or easily duplicated by the industry." Instead, all of the individual features were so obvious that the overall system was "readily replicable by anyone who has been exposed to its various components; one need not also have knowledge of a special formula or technique for combining those components." *Id*. at 1075.

The fact that the trade secret asserted here is the GapC source code, not merely the features of the practice management software it embodies, differentiates this case from *Computer Care*. In *Computer Care*, the plaintiff unsuccessfully asserted trade secret protection for the ideas behind the individual features of its computerized direct mail system. But the Seventh Circuit noted that although the ideas themselves were not new or novel, the manner in which these features were executed could have been a protectable trade secret. *Id*. at 1073 n.8 ("Of course, the *way* in which Computer Care adjusts its service cycles—that is, the software it uses to perform that task—is protectable, but that is distinct from the mere idea of adjusting service cycles to customers' needs.") (emphasis in original). In this case, Geraci is not claiming that his law-practice management ideas and features are trade secrets—and he may not assert such a theory at trial. His claim here is that his protectable trade secret is the GapC source code, which is the way that the software implements his law-practice ideas.

16

Viewing facts in the light most favorable to Geraci, unlike the direct mail system in *Computer Care*, the GapC source code may have combined the features of consumer bankruptcy law practice management into a unified process design, the operation of which in unique combination afforded a competitive advantage. *Computer Care*, 982 F.2d at 1074; *see, e.g., Minnesota Mining*, 259 F.3d at 596 (finding protectable trade secret in the operating procedures, quality manuals, trade manuals, process standards, and operator notes for using resin sheeting process created over the course of six years; "These manuals and processes, even if comprised solely of materials available in the public domain, have been created by combining those materials into a unified system which is not readily ascertainable by other means.").

Defendants also cite to *Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691 (Minn. 1982), where a computer-aided design system for producing ring molds was not a protectable trade secret. But that finding in *Jostens* was not made at summary judgment. Upon weighing conflicting evidence at trial, the court found that there was no trade secret because the system's combination of components could have been readily duplicated by those in the industry and also because there was a decided lack of secrecy, as the plaintiff had permitted publication of an article explaining the system to other experts in the field. *Id.* at 698–701. Unlike *Jostens*, Geraci undisputedly took steps to keep the GapC source code confidential, and summary judgment is not the appropriate time to weigh conflicting evidence about whether GapC was made with great or little effort.

In sum, there is evidence that Geraci spent time, money, and effort to develop GapC source code, which in turn, had economic value as a business-management technique, and was kept confidential by Geraci. As a result, a jury might conclude that there was some economic value in the secrecy of the source code. This is by no means a foregone conclusion, and all of the code's value may be in its function, not its confidentiality. Nevertheless, questions of material fact preclude summary judgment for defendants on whether GapC was a protectable trade secret.

### 2. Misappropriation

Amidon joins Macey's argument that GapC is not a trade secret, [186] at 1, but mainly argues that there is no evidence that he misappropriated anything. Misappropriation can be shown by improper acquisition, unauthorized disclosure, or unauthorized use. *Liebert*, 357 Ill.App.3d at 281 (citing 765 ILCS 1065/2(b)). The Illinois Trade Secrets Act, 765 ILCS 1065/2(b), defines "misappropriation" as: "(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of a person without express or implied consent by another person" who used improper means or knew that the trade secret was obtained through improper means, accident, or mistake. "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means," but it does not include reverse engineering or independent development. 765 ILCS 1065/2(a). Amidon argues that he copied Geraci's software merely to make backups and that no Geraci materials were used

to develop LH1. Geraci contends that the veracity of Amidon's story rests on credibility determinations that must be resolved at trial.

There are genuine issues of fact over whether the GapC source code was misappropriated. It is undisputed that Amidon was not authorized to copy or disclose GapC source code. Geraci took many steps to ensure the confidentiality of GapC, including restricting its access to only a few employees, requiring programmers to work in their own locked office, and forbidding removal of computer code from the premises. He also made Amidon agree not to share his work for Geraci with anyone else. But Amidon did remove computer code from the premises—indeed, he was fired immediately when Geraci found out about it. Although Amidon argues that his reasons for removing code were innocuous, that is a credibility determination for a factfinder.

Other facts, when taken together, could support the inference that Amidon improperly disclosed GapC source code to Legal Helpers or used it in creating LH1. Chern approached Amidon about working for Legal Helpers as early as 1996, and Amidon was present on the Legal Helpers premises within weeks of Chern's appearance. [180] ¶ 90.[8] There are also questions of fact regarding the similarity between GapC and LH1. Of the 125 files in LH1 and 137 files in GapC, 64 program files are contained in both source codes, which share 25% of their code. [178] ¶ 46; [180] ¶ 46. Although the parties agree that the existence of the same program files

---

[8] Paragraphs 81 to 95 in Geraci's Local Rule 56.1 statement of additional facts, [180], are deemed admitted by Amidon, since he filed no response. *See* LR 56.1.

in GapC and LH1's source code does not mean that the *contents* of those program files are identical or similar, the parties dispute whether these common files were largely automatically generated by Zachary. [178] ¶¶ 47–48; [180] ¶¶ 47–48. One of these files includes various misspellings that are found in both the GapC and LH1 versions. [180] ¶ 94. In addition to these similarities, other evidence suggests that GapC may have been misappropriated. For example, after Amidon began assisting at Legal Helpers, Geraci's name printed on documents generated by the Legal Helpers computers. [180] ¶ 90. GAP-related materials were also found on the Legal Helpers computer server, although Amidon denies responsibility for that, and defendants deny that GAP materials were ever incorporated into LH1. [178] ¶¶ 75–78; [180] ¶¶ 76–77.

Issues of material fact on whether GapC is a trade secret and was misappropriated preclude summary judgment for defendants on Geraci's trade secret claims.

### III. Conclusion

Defendants' motions for summary judgment [149] and [155] are denied. A status hearing is set for 7/21/16 at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: 7/11/2016